UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| B.L.M, a minor, <br> by his guardian KAYLA M.[1], <br><br> Plaintiff, <br><br> v. <br><br> KILOLO KIJAKAZI, Acting <br> Commissioner of Social Security, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) CIVIL NO. 3:21cv15 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying Plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, § 1383(c)(3). Section 205(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. §405(g).

The law provides that an applicant for children's disability benefits must establish "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be

---

[1] For privacy purposes, Plaintiff's full name will not be used in this Order.

expected to last for a continuous period of not less than 12 months." 42 U.S.C. §1382c(a)(3)(C)(i) (2011). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after a hearing, the Administrative Law Judge ("ALJ") made the following findings:

1. The claimant was born on March 11, 2010. Therefore, he was a school-age child on October 4, 2018, the date application was filed, and is currently a school-age child (20 CFR 416.926a(g)(2)).

2. The claimant has not engaged in substantial gainful activity since October 4,

2

         2018, the application date (20 CFR 416.924(b) and 416.971 *et seq*.).

3.     The claimant has the following severe impairments: attention deficit hyperactivity disorder (ADHD); autism; and disruptive mood dysregulation disorder (20 CFR 416.924(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5.     The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

6.     The undersigned finds that the claimant has not been disabled, as defined in the Social Security Act, since October 4, 2018, the date the application was filed (20 CFR 416.924(a)).

(Tr. 16-28).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to benefits, leading to the present appeal.

Plaintiff filed his opening brief on October 26, 2021. On December 30, 2021 the defendant filed a memorandum in support of the Commissioner's decision to which Plaintiff replied on January 13, 2022**.** Upon full review of the record in this cause, this court is of the view that the Commissioner's decision should be remanded.

A child's disability claim is analyzed under a three-step sequential evaluation process to determine whether a child claimant is disabled. 20 C.F.R. § 416.924 (2012); *Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir.2007). First, if the child is engaged in substantial gainful activity, he is not disabled. 20C.F.R. § 416.924(b). Second, if the child's impairments are not severe, *i.e.*, causes no more than minimal functional limitations, he is not disabled. 20 C.F.R. § 416.924(c). Third, if the child's impairments meet, medically equal, or functionally equal the listings (20

3

C.F.R pt. 404, subpt. P, app. 1), then he is disabled. 20 C.F.R. § 416.924(d). If the claimant is found to suffer from one or more severe impairments that meet or are medically equivalent to a listing, the ALJ must enter a finding of disability. 20 C.F.R. §§ 416.924(d)(1), 404.1520(d). If not, the ALJ must then consider functional equivalence. 20 C.F.R §§ 416.924(d); 416.926a.

To determine whether an impairment is the functional equivalent of a listing, an ALJ evaluates its severity in six domains: 1) acquiring and using information, 2) attending and completing tasks, 3) interacting and relating with others, 4) moving about and manipulating objects, 5) caring for oneself, and 6) health and physical well-being. 20 C.F.R. § 416.926a(a), (b)(1). Functional equivalence exists, and a child qualifies for benefits, if the ALJ finds a marked difficulty in two domains of functioning or an extreme limitation in one. *Id*. § 416.926a(a).

On August 9, 2017, Plaintiff met with his therapist, Dr. Onkka, regarding his mother's concerns about his actions and mood swings. (Tr. 337.) She stated that there were inconsistencies in Plaintiff's responses to his environment and that he had problems wiping himself after bowel movements. *Id*. She reported problems with hand-eye coordination and poor handwriting. *Id*. In November 2017, Plaintiff underwent assessment for his various issues. (Tr. 356.) The assessment found that Plaintiff had ADHD, combined type. His doctor increased his focalin to get him through school. (Tr. 356.) It was noted that he may be bipolar. *Id*. Sometimes Plaintiff feels his medication wears off during the day which leads him to have a bad attitude and be emotional. *Id*.

In February 9, 2018, Plaintiff presented to Dr. Beechler. (Tr. 362.) The reason for the consult was that Plaintiff was delayed in fine motor skills and unable to complete daily functioning, with a previous diagnosis of ADHD. (Tr. 360.) Dr. Beechler noted that Plaintiff had been diagnosed with ADHD and treated with dexmethyphenidate each morning. (Tr. 360.)

Plaintiff had a moderate articulation disorder and received school-based speech therapy. *Id*. Plaintiff was noted to be easily angered and would kick and hit his mother. *Id*. His therapists noted that he has a lot of difficulty with fine motor skills and activities of daily living. *Id*. It was noted that Plaintiff had problems wiping after using the restroom, bathing, using utensils, and dressing. *Id*. Plaintiff's handwriting is not grade level. *Id*. He often is extremely bothered by being touched on his head or being in water. (Tr. 360.) Dr. Beechler opined that Plaintiff's symptoms are consistent with ADHD and that he needed to go to occupational therapy to address these symptoms. (Tr. 362.) His findings were that Plaintiff had ADHD, combined type, fine motor delay, and articulation disorder. *Id*.

In June 2018, Plaintiff was referred to his therapist, Dr. Onkka, to address anger management. (Tr. 338.) Dr. Onkka noted that Plaintiff has been diagnosed with ADHD and was on medication but continued to experience rage attacks, emotional explosions, difficulty sleeping at night, racing thoughts, and impulsive behaviors. (Tr. 338.)

On September 6, 2018, Plaintiff presented to Dr. Reddy. (Tr. 384.) Dr. Reddy noted that Plaintiff struggled with attention span, was easily distractible, fidgety, and hyperactive, had a hard time following directions, was defiant, talked out of turn, frequently interrupted conversations and frequently interrupted class. *Id*. It was noted that Plaintiff had exhibited these persistent symptoms since he was four years old. *Id*. Plaintiff is sensitive to loud noises, certain clothing textures, and food textures. He exhibited repetitive behavior, had a tendency to watch videos multiple times and to repeat phrases. *Id*. Dr. Reddy noted that Plaintiff struggled with social skills and making eye contact during conversation. *Id*. Plaintiff was noted as being quick to anger, easily irritable, and struggled sleeping at night. *Id*. Dr. Reddy, in his neuropsychiatric

5

exam, found that Plaintiff makes limited eye contact, has hyperactivity, irritable mood, linear thought process, some obsession, poor insight, and poor but improving judgment. (Tr. 385.)

In October 2018, Plaintiff presented to Dr. Reddy at Beacon Medical Group where he was treated for autism spectrum disorder requiring support. (Tr. 367.) Dr. Reddy noted that Plaintiff would benefit from a "504 plan." *Id*. The same month, the Indiana Department of Education made reports that noted that Plaintiff exhibited mild to moderate articulation delay with lateral distortions and substitution errors voiced and voiceless. (Tr. 387.)

The next month, Plaintiff presented again to Dr. Reddy. (Tr. 379.) Dr. Reddy listed Plaintiff's problems as ADHD, DMDD, and autism spectrum disorder requiring support. *Id*. Dr. Reddy changed Plaintiff's medication from vyvanse to daytrana. (Tr. 380.)

On December 10 and 17, 2018, Plaintiff underwent an Occupational Therapy Initial Evaluation. (Tr. 441.) In this assessment, Plaintiff scored in the 10th percentile on a Beery VMI test for eye-hand coordination, and in the 19th percentile on a VMI Test for visual perception. *Id*. The assessment noted that Plaintiff had unusual reactions to sounds like a loud classroom and was easily upset without medication. (Tr. 441.) In the Occupational Therapy summary it was noted that Plaintiff exhibited visual, motor, perceptual, and fine motor deficits. (Tr. 442.) He presented with sensory processing concerns at school and it was recommended he receive occupational therapy services at school to address his deficits. *Id*.

In February 2019, Plaintiff presented to Dr. Reddy. (Tr. 373.) Plaintiff's medication changes included Daytrana patch, Depakote tablet, and Vyvanse. (Tr. 374) Dr. Reddy believed Plaintiff's medications were helping with his symptoms at school. (Tr. 375.)

On March 15, 2019, the Indiana Department of Education's speech therapy notes recited

6

that Plaintiff correctly produced words with 80% accuracy. (Tr. 224.)

On May 1, 2019, Plaintiff presented to Dr. Reddy for a Behavioral Health Visit. (Tr. 431.) Dr. Reddy commented that Plaintiff's ADHD symptoms were fairly well controlled by the Daytrana Patch. *Id*. Dr. Reddy's neuropsychiatric exam of Plaintiff revealed that Plaintiff made limited eye contact, had improved hyperactivity, euthymic mood, some obsession, limited concentration, poor insight, and poor but improving judgment. (Tr. 432.)

On October 5, 2019, Dr. Reddy completed a Medical and Functional Capacity Assessment. (Tr. 444.) In his assessment, Plaintiff had two diagnoses, autism spectrum disorder and ADHD, both diagnosed on September 6, 2018. *Id*. Plaintiff's symptoms included poor affection, emotional dysregulation, behavioral dysregulation, and impulse dysregulation. *Id*. Dr. Reddy noted that these symptoms would persist for longer than twelve months. *Id*. Dr. Reddy opined that Plaintiff had a moderate impairment in acquiring and using info, moving about and manipulating objects, and caring for himself. (Tr. 446-448.) Plaintiff also had marked impairments in attending and completing tasks as well as interacting and relating with others. *Id*.

In educational records from November 2019, one of Plaintiff's teachers filled out a questionnaire regarding his performance in class. (Tr. 284.) She noted that in regards to acquiring and using information Plaintiff had slight problems with providing organized oral expirations and adequate descriptions. (Tr. 284.) He had obvious problems expressing ideas in written form and applying problem-solving skills in class discussions. *Id*. She noted that his writing was odd and he struggled to write as the narrator, often writing as if he were talking, and often failing to make sense. *Id*. He was also noted as not accepting constructive criticism. *Id*. With regard to attending and completing tasks, his teacher noted that Plaintiff had slight problems carrying out

multi-step instructions, waiting to take turns, and organizing his things and school materials. (Tr. 285.) He exhibited obvious problems working at a reasonable pace and finishing on time. *Id*.

In the same questionnaire, Plaintiff's teacher noted that he had slight problems playing cooperatively with others, expressing anger appropriately, following rules, relating experiences and telling stories, and interpreting meanings of facial expressions. (Tr. 286.) She noted he struggled to respond to frustrations or annoyances appropriately. *Id*. She stated that to cope with Plaintiff's struggles he was provided with a quiet place to go in the mornings. *Id*. The teacher also noted that in unstructured settings Plaintiff misinterprets other peoples' actions and responds with angry words and physical actions. She had him go to quiet classrooms to avoid situations that might lead to physical aggression. *Id*. His teacher also stated that Plaintiff had slight problems being patient when necessary and using appropriate coping skills to meet the daily demands of the school environment. (Tr. 288.) He had obvious problems handling frustration appropriately, identifying and appropriately asserting emotional needs, and responding appropriately to changes in his own mood. *Id*. His teacher stated that he needed support for coping skills so that he does not yell or use inappropriate language with other students. *Id*. His teacher noticed that there were a few instances of hitting when he gets mad at the way another student acts toward him. *Id*. The teacher stated that Plaintiff struggled to forgive and forget, often assuming the intention of others were negative. *Id*.

In November of 2019, the State of Indiana, through the Bureau of Developmental Disabilities Services (BDDS) and the Division of Disability and Rehabilitative Services (DDRS), determined Plaintiff met its criteria for "Person-Centered Individualized Support Plan." (Tr. 449-470.) In doing so, they indicated Plaintiff required "24/7 supports"; does not have "stranger

danger skills"; does not "understand the need to exit in cases of emergency"; "cannot call 911"; requires assistance with "peri-care"; verbal assistance required with grooming, bathing, oral care and picking weather-appropriate clothing; does not "understand the value of money"; does not "understand the need to complete required activities"; requires food to be "cut up in dime sized pieces"; and "needs assistance setting time on microwave." (Tr. 452, 459.)

At the hearing before the ALJ Plaintiff testified that he was right-handed and that he does not and cannot work. (Tr. 41.) When the ALJ asked Plaintiff about what medications he was taking, he responded that he uses a medicated patch that calms him down. *Id*. Plaintiff testified that he uses the patch every day at school. *Id*. Plaintiff testified that he was in fourth grade at Clay International Academy. (Tr. 42.) He stated that he plays football at recess and can do everything that the other children can do during recess. (Tr. 43.) When asked whether he got along with kids at school, he replied that he does with the exception of a fight last year. *Id*. He stated that another child was making fun of him and he "couldn't stand it, so [he] went up to him and slapped him in the face." *Id*. Plaintiff testified that he got in trouble for his actions and has not fought since then. *Id*.

Plaintiff testified that he had friends at school that he often played football with and sits with at lunch. (Tr. 45.) He stated that he has two pets at home which he helps feed and let outside. *Id*. His other chores include keeping his room clean. *Id*. He stated that he did not have problems feeding himself or brushing his teeth. (Tr. 46.) Plaintiff stated that in his free time he often reads, plays games, or does his homework. *Id*. He stated that he did have trouble putting on his pants and that his feet get stuck. *Id*.

The ALJ then questioned Plaintiff's mother. (Tr. 50.) The ALJ asked Plaintiff's mother if

9

there was anything in her son's testimony that she wanted to clear up or disagreed with. *Id*. She testified that Plaintiff downplayed the difficulty of getting dressed. She stated that he often puts his underwear and shirts on backwards. *Id*. He also frequently has his shirts and pants scrunched up or rolled up. *Id*. She testified that he uses the medicated patches seven days a week for nine hours a day. *Id*. Plaintiff's mother testified that she has to cut up his food, especially his meat, because he is a messy eater and messy with his hands which makes holding a fork awkward. (Tr. 50-51.) His mother also washes his hair and provides peri-care. (Tr.51.)

Plaintiff's counsel then asked Plaintiff's mother about Plaintiff's problems at school. (Tr. 51-52.) Plaintiff's mother testified that in the mornings there is a two-hour period before his patch takes effect. (Tr. 51-52.) She stated that during that time Plaintiff is not allowed in the general population of the gym because there were issues of him getting into confrontations with people. (Tr. 52.) She related an incident where Plaintiff was overly-stimulated and a girl was playing with a basketball that he wanted, so he sat on her and pushed her to the ground. *Id*. Plaintiff's mother testified that once Plaintiff's patch kicked in there was noted regret of the situation. *Id*.

Plaintiff's mother testified that Plaintiff gets in arguments often and he once chased another child down the hallway like he was going to bite him. *Id*. When Plaintiff does not have the medicated patch on his mother stated that he gets squirmy, restless, jittery, shifts his toys, and makes noises with his mouth. (Tr. 53.) She testified that he is more irritable when the patch is not having an effect. (Tr. 54). Plaintiff's mother testified that when she tells him to do something he often starts touching his head, fidgeting with his clothes, and puts his clothes in his mouth. *Id*.

Plaintiff was diagnosed with autism spectrum disorder the previous September. (Tr. 54.)

10

His mother noted that he goes to "OTX school" to help with his handwriting because it is often backwards or unreadable. (Tr. 54-55.) She stated that he was first on an oral medication for ADHD before being put on the patch. (Tr. 56.)

In support of remand, Plaintiff argues that The ALJ committed harmful error in failing to consider the State of Indiana's conclusion that Plaintiff was eligible for a Home and Community Based Services (HCBS) waiver[2] which provides for "non-residential supports to individuals with developmental disabilities who live with their families or in other settings with informal supports." (Tr. 450.) Specifically, Plaintiff qualified for the "Family Supports HCBS Waiver"[3] (*Id.*) Plaintiff states that the State of Indiana's approval for this sort of intervention was based on

---

[2] Indiana Medicaid pays for services for individuals who choose to remain in their home as an alternative to receiving services in an institution, such as a nursing facility. These services are referred to as home and community-based services. These programs are intended to assist a person to be as independent as possible and live in the least restrictive environment possible while maintaining safety in the home. https://www.in.gov/medicaid/members/home-and-community-based-services

[3] The Family Supports home-and community-based services waiver provides limited, non-residential supports to individuals with developmental disabilities who live with their families or in other settings with informal supports. Individuals must meet HCBS waiver eligibility and Medicaid eligibility guidelines in order to be eligible for a Medicaid HCBS waiver. To be eligible individuals must:
- Be diagnosed as having an intellectual disability prior to the age of 22
- Reside in or transitioning into an HCBS-compliant setting (non-institutionalized)
- Have income no greater than 300% of maximum Supplemental Security Income amount
- Meet "ICF/IID level of care"

For the purposes of ICF/IID level of care, a person must have a disability that:
- Results in impairment of functioning similar to that of a person who is intellectually disabled, including autism spectrum disorder, epilepsy, cerebral palsy, or a similar condition (other than mental illness)
- Originates before the person is 22 years of age
- Has continued or is expected to continue indefinitely
- Substantially limits a person's ability to function normally in society in three of the six major life areas: self-care, receptive and expressive language, learning, mobility, self-direction, and capacity for independent living
- Requires access to 24-hour assistance, as needed

https://www.in.gov/medicaid/members/home-and-community-based-services/family-supports-waiver/

its conclusion and observation of Plaintiff's exhibiting limitations consistent with an "extreme" limitation to his ability to care for himself and should have been considered by the ALJ.

20 CFR § 416.924a, which is titled "Considerations in determining disability for children" states:

> (a) *Basic considerations*. We consider all evidence in your case record (see §416.913). The evidence in your case record may include information from medical sources (such as your pediatrician or other physician; psychologist; qualified speech-language pathologist; and physical, occupational, and rehabilitation therapists) and nonmedical sources (such as your parents, teachers, and other people who know you).
>
> \*   \*   \*
>
> (2) *Statements from nonmedical sources*. Every child is unique, so the effects of your impairment(s) on your functioning may be very different from the effects the same impairment(s) might have on another child. Therefore, whenever possible and appropriate, we will try to get information from people who can tell us about the effects of your impairment(s) on your activities and how you function on a day-to-day basis. These other people may include, but are not limited to:
>
> (i) *Your parents and other caregivers*. Your parents and other caregivers can be important sources of information because they usually see you every day. In addition to your parents, other caregivers may include a childcare provider who takes care of you while your parent(s) works or an adult who looks after you in a before-or after-school program.
>
> (ii) *Early intervention and preschool programs*. **If you have been identified for early intervention services (in your home or elsewhere) because of your impairment(s), or if you attend a preschool program (e.g., Headstart or a public school kindergarten for children with special needs), these programs are also important sources of information about your functioning. We will ask for reports from the agency and individuals who provide you with services or from your teachers about how you typically function compared to other children your age who do not have impairments.**
>
> (iii) *School*. If you go to school, we will ask for information from your teachers and other school personnel about how you are functioning there on a day-to-day basis compared to other children your age who do not have impairments. We will ask for any reports that the school may have that show the results of formal testing

12

> or that describe any special education instruction or services, including home-based instruction, or any accommodations provided in a regular classroom.

20 C.F.R. § 416.924a.

Plaintiff argues that where a state-licensed professional assessed the severity of the functional limitations of a child claimant and has effectively offered an opinion of limitations, an ALJ should consider and articulate a rationale for her departure from such a source. Plaintiff asserts that had the ALJ considered this opinion she could have reasonably concluded Plaintiff had an "extreme" limitation in the functional domain of "Caring for Yourself," a finding which would have resulted in a conclusion of disability per 20 CFR §§ 416.924(d) and 416.926a.

As Plaintiff was ten years old at the time of the ALJ's decision, the ability to "Care for Yourself" is considered in contrast to how an unimpaired ten-year-old is able to care for themselves. In concluding Plaintiff required a family supports waiver, the State of Indiana determined Plaintiff had "a disability that results in impairment of functioning similar to that of a person who is intellectually disabled, including autism spectrum disorder, epilepsy, cerebral palsy, or a similar condition (other than mental illness)"; "originates before the person is 22 years of age"; "has continued or is expected to continue indefinitely"; "substantially limits a person's ability to function normally in society in three of the six major life areas: self-care, receptive and expressive language, learning, mobility, self-direction, and capacity for independent living"; and "requires access to 24-hour assistance, as needed." Plaintiff contends that an individual who met these criteria could reasonably be found to have an "extreme" limitation in "Caring for Yourself."

Social Security regulations provide examples of limitations in the domain of "Caring for

13

Yourself" but the question of whether such limitations are to be considered "extreme" is to be evaluated within the context of the child's age. 20 C.F.R. § 416.926a(k)(3). Some of those examples include "does not feed, dress, toilet, or bathe self age-appropriately"; and "engages in self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take medication), or ignores safety rules." *Id*.

In response, the Commissioner argues that the ALJ properly declined to articulate her consideration of the State Agency's determination. The Commissioner cites to 20 CFR § 416.920b(c)(1)(Evidence that is inherently neither valuable nor persuasive),which in turn cites to §416.904 (Decisions by other governmental agencies and nongovernmental entities), which states::

> *Other governmental agencies and nongovernmental entities* —such as the Department of Veterans Affairs, the Department of Defense, the Department of Labor, the Office of Personnel Management, State agencies, and private insurers—make disability, blindness, employability, Medicaid, workers' compensation, and other benefits decisions for their own programs using their own rules. Because a decision by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules. Therefore, in claims filed (see §416.325) on or after March 27, 2017, we will not provide any analysis in our determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits. However, we will consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that we receive as evidence in your claim in accordance with § 416.913(a)(1) through (4).

The Commissioner concludes that because the Division of Disability and Rehabilitative Services (DDRS) is a state agency that determined that Plaintiff was eligible for benefits that it administers under its own rules, the ALJ did not have to discuss its determination in her decision.

14

The Commissioner also contends that there is no medical opinion (or other) evidence in the record underlying this decision for the ALJ to have considered.

The Commissioner also asserts that the ALJ did acknowledge and consider the Plan created as a result of Plaintiff's eligibility for DDRS services. *See* Tr. 449-70 (Exhibit 14F). That is, the ALJ acknowledged, in one sentence, that Plaintiff's mother had reported on November 21, 2019, during the formulation of this Plan, that Plaintiff needed assistance with personal hygiene and domestic skills. (Tr. 25, citing Tr. 453). Yet the ALJ did not discuss the Plan in any detail. Rather, the ALJ implied that the State of Indiana grants HCBS waivers solely because a parent says their child needs assistance (without any other evidence), which is not how the waivers are structured.

The Commissioner fails to discuss the possible applicability of 20 CFR § 416.924a(a((ii). As this is a child disability case, it seems reasonable for the regulations specific to child disability determinations to take precedence over the general, adult regulations. The child regulations specifically state that "early intervention services" will be considered. Thus, this Court finds that the ALJ erred in failing to consider the Individualized Support Plan that was developed for Plaintiff. While neither party explains to the Court how HCBS waivers are granted, and the Individualized Support Plan is somewhat cryptic, the Court has discerned that Plaintiff's "Level of Care"[4] needed was assessed on November 6, 2019. (Tr. 452.) The only corresponding records near that date are various assessments provided by Plaintiff's teachers and a school psychologist.

---

[4] Logically, it is the Level of Care needed that determines whether a child receives waiver services, since the purpose of the services are to permit the child to remain at home rather than being institutionalized. Thus it would follow that the State Agency determined that Plaintiff qualified for institutional care, as per the relevant Medicaid guidelines, which would likely be a high level of disability. However, neither party specifically discusses this point.

15

Thus it may be, as the Commissioner argues, that the records relied upon by the ALJ to deny disability were the same records the State agency relied upon to grant the HCBS waiver. However, as the ALJ did not discuss the Plan, this Court is unable to discern whether all the relevant evidence was properly considered. Due to the lack of clarity in the record, and the paucity of helpful details in the briefing, the Court will remand this case so that the Individualized Plan of Care can be considered as set forth in 20 CFR § 416.924a(a)(2)(ii).

## Conclusion

On the basis of the foregoing, the Decision of the Commissioner is hereby REVERSED AND REMANDED for further proceedings consistent with this Opinion.

Entered: January 19, 2022.

                                                s/ William C. Lee  
                                                William C. Lee, Judge  
                                                United States District Court